Let's wait a minute and just let everyone get settled. You tell me, Your Honor. Okay. Mr. Green? I'm Mr. Howard. Sorry, you're Mr. Howard. You're absolutely right. I understand. Thank you, Your Honor. May it please the Court. Good morning. My name is Andrew Howard. I'm honored to be here today before you representing my client, Ms. Jennifer Sugg. We respectfully request that the Court reverse the District Court's grant of summary judgment and remand for trial. The trial court's ruling was based on its holding that academic discretion allowed it to reject the summary judgment standard, and I quote, the Court rejects Sugg's argument that she was entitled to presumptions and inferences in her favor as the non-movement in a summary judgment procedure. In doing so, the District Court erred and presented three de novo issues. First is whether private universities, like Appellee Midwestern, are entitled to the academic discretion that arose from principles of federalism and separation of powers in the Supreme Court in Horwitz. If the Court finds that private universities are not, the analysis ends there. Second, whether the trial court inverted that summary judgment standard and made a factual determination and a credibility determination that Midwestern's decisions at issue actually were academic decisions. In fact, Midwestern admitted in its summary judgment briefing that there was evidence its decision was disciplinary in nature. This issue is also dispositive. Third, whether the decisions at issue were made by academics at all. Here, Midwestern University outsourced its academic decision-making to the other appellee, Emergence Health, who are independent contractors of independent contractors subject to no oversight, control, or academic training. It almost should go without saying that to be entitled to any sort of academic discretion, you must be an academic. If the Court, however, finds against Ms. Sugg on all three of these issues, it places private corporations that is subject to no oversight or control. Am I correct that four different Texas courts of appeals have extended Horwitz to private universities? I don't know about that number. There are a handful of courts that have discussed Horwitz deference, but none of those have been in the precise context of whether or not, for example, under both issues two and three, whether or not the decisions at issue were disciplinary and whether or not those decisions at issue were made by academics. And none of those cases referred to the specific separations of powers arguments that underline academic discretion itself. I mean, this kind of harkens back to the case before this, Your Honor, in that this is treated almost like immunity. The genesis of the academic discretion doctrine comes from discussion of private universities, private universities who are governed by the Constitution and by due process considerations. And that's where discretion came up, in the amount of procedure due to a public university in the context of an academic decision or in the context of a disciplinary decision. And the deference is much less in an academic decision. And those public universities are, of course, subject to external control. They are subject to the control of elected officials. They are subject to a control of the voters, of the public. Private universities are not the same. There is a circuit split applying federal law as to whether or not academic discretion applies to private universities. The Fourth and D.C. circuits have expressly found that private universities are not subject or are not entitled to academic discretion for contractual issues. And that is one issue that separates our case from many, is that what we are talking about here is not the academic judgment of these individual independent contractors of independent contractors, but we are talking about whether or not Midwestern complied with its contractual and tort promises. Other circuits have applied academic deference to private universities, but they have not done so by tying it to the underlying principles of federalism and separation of powers that are at its genesis. Relating to that federalism and separation of powers issue, in 1991 this circuit affirmed the Horowitz decision and expressly discussed its basis in principles of federalism. There are no better examples of the respect for the integrity of local decision-making authority with regard to education than Gosphy, Lopez, and Horowitz. And again, turning the distinction between due process and contract and tort, this court has also held contract governs the relationship between private universities and our students. In Dixon v. Alabama State Board of Education, this circuit recognized that the relations between a student and a private university are a matter of contract, that's 294 F. 2nd. 157. And recently this court held, when addressing claims against a private university, that, quote, courts act well within their expertise when answering the elementary question of whether a contract was made and breached, and we think that is the issue that should have been before the court. And that was Jones v. Administrators of the Tulane Educational Fund, 51 F. 4th. 110 from 2022. And again, the distinction between private and public universities is important. Government actors are constrained by the ballot box and courts are constrained from interfering in the activities of the state vis-à-vis the 14th Amendment. Private actors are not so bound. Private actors are governed by their contractual and tort duties, among other requirements of common and statutory law, under which Ms. Sugg sued in this case. To find contrary to Fifth Circuit precedent in this case would allow private universities to avoid those duties, which can create a significant burden for taxpayers and create kind of a power vacuum into which other branches of government may step. And we talk about this in pages 23 and 24 of our brief. But also the court recently addressed this attempted expansion of power on April 4th, 2024 in career colleges and schools of Texas versus the U.S. Department of Education, which included an attempt by the executive to create an administrative scheme in which school must answer for misrepresentations to students. You know, if there is a vacuum, if students may not seek relief regarding private universities, that vacuum will be filled. Appellees have not responded to direct arguments regarding whether they have any external watchdog. Of course they don't want an external watchdog. They have not cited a single case that attires academic discretion granted a private university to the federalism and separation of powers that birthed it. In this absence of authority and argument, the court should remand. Relatedly, and as an independent issue, it was clear error for the district court to rule as a matter of law that Midwestern's evaluation of SUG was academic based only upon Midwestern's after-the-fact claim that it was. And it is undisputed that in due process context, disciplinary decisions require greater process and are not entitled to the same deference as academic decisions. In the case at bar, Midwestern's contractual documents also require a more stringent procedure for disciplinary behaviors, and they also explicitly state that the actions of which SUG was accused were disciplinary issues. More importantly, we know how a disciplinary review would have resulted. In this case, the final decision-maker for a disciplinary review is the dean of students, Dean Kaczynski. Dean Kaczynski expressly found Ms. SUG should be allowed to continue. So had the correct procedures to which Midwestern contractually agreed applied, Ms. SUG would have been allowed to continue. The district court simply ignored this in its subverting of the summary judgment standard, creating a new burden-shifting paradigm that is unsupported in federal law. This allows a private university to simply say, my decision was academic, and be done with it, thereby divesting the court of any ability to review those decisions. But Midwestern did not satisfy its burden to show beyond a material issue of fact that its decisions were, in fact, academic. Again, even in its briefing, Midwestern admitted there was evidence that, quote, that suggests certain acts of SUG could have subjected her to dismissal for disciplinary reasons, close quote. That's at the record 4609. That evidence included the contractual documents themselves state what is disciplinary and what is academic. That's at record site 3045 through 47. Brian Estavio, the professor, quote, unquote, in charge of the clinical program, stated explicitly Ms. SUG was failing for a disciplinary reason. The program director, Terrence Burroughs, stated he would fail Ms. SUG for disciplinary reasons. And then further later, when faced with a lack of evidence of any academic concerns, further stated, quote, the best course of action may be to focus on academic dishonesty and other disciplinary concerns. And that's at 3125. With admitted factual issues of whether the challenge decisions were academic at all, it was error for the district court to provide Ms. SUG with none of the procedural protections granted non-movements and to accord her evidence literally no weight. A jury should decide whether Midwestern's decisions were academic at all. Relatedly, there is no court that has said academic discretion can be expanded indefinitely to uncontrolled, untrained, unsupervised, inexperienced non-academics. Appellees believe that's okay, that they can indefinitely expand discretion to whomever they designate, regardless of training or aptitude. In fact, one appellee expressly argues that this case turns on the balancing of positive and negative reviews in the appropriate academic judgment of the clinical site coordinator. Now, this kind of structure is set out in our brief, but the actual grading at issue was based upon a one-page form given to certified registered nurse anesthetists, which is difficult to say, so we just say CRNA. Those CRNAs observe the students in practicum. They fill out their one-page form. That form goes to the clinical coordinator, who is also not a university employee. That clinical coordinator subjects a summative evaluation to a brightest of you in this case, the faculty advisor. What the record shows is that Midwestern did not evaluate or consider the qualifications or the reports of a single CRNA preceptor. That's at 2679. That Midwestern exercises zero control over who it selected as a coordinator, cannot hire or fire them, cannot investigate student allegations against them, and has no control over coordinator management of students. Richard Epstein, the coordinator at Ipshu, also had zero teaching or faculty experience. Mr. Epstein relied solely upon his independent contractors, those CRNA preceptors, but Midwestern accepts the credibility of those preceptors absolutely, and that is a quote from their 30B6 witness, and that they have never challenged a preceptor's recollection events. That none of the preceptors had any teaching experience or any faculty positions. That some preceptors started evaluating students on day one, the first day they became practicing CRNAs. And that there is no requirements for being a preceptor other than being a CRA, that there is no formal training, and that neither emergency health nor Midwestern does anything to vet these preceptors. In fact, literally the only training they received was receiving the single-page grading form, and that is by testimony of Midwestern's 30B6 at Record 3020. If any academic deference exists, it cannot be expanded this far. Nothing in this clinical evaluation is academic. Rather, appellees want to expand deference far beyond the purported student-teacher relationship. Under the lower courts' reading, all a private university must do is simply state that it relied upon the evaluation of any independent contractor, and thus divest the district court and this court of the ability to review that third party's decision-making. There is no support in the law for that proposition. There is no support in the law for creating that power vacuum. Ms. Zucker respectfully requests that the court remand this case for trial. I'm pleased to answer any questions. Our briefing sets out the evidence in support of our claims under the traditional summary judgment standard, and I can cover that with the court, or I can ask questions and yield my time until rebuttal. All right. Thank you, Mr.. Thank you. You've saved time for rebuttal. Thank you, sir. Good morning, Your Honor. What I have just heard for the last five, six minutes about the minutiae of how the ratings were done, how many evaluations were good or bad, or who was truthful or who was . . . All of those kinds of matters are things that the university itself would be determining. So what we're here to do today is to determine whether or not we even get there. And so what I wanted to do today is . . . In looking at some of the cases that this court has looked at, this, to me, looks like a great case for clarifying the issue of academic decision-making with regard to the kinds of activities that were going on, especially in a medical field. As this court is aware, Ms. Sugg was involved in a CRNA program, which is a nerve anesthesia program, which involves putting people to sleep, which involves knowing what kind of drugs are to be used and all those sorts of things. And so it is critical that the people on the ground, the people that work with her, they be able to make those decisions. I don't think I need to spend a whole lot of time on that, except their big argument is it's private versus public, and somehow they have argued that it is so obvious that it is federalism that somehow is the magic formula that is the basis for academic decision-making, which I would say, even in the cases they cite, I don't follow his argument. I find it to be nonsensical. In fact, I would just kind of start and look at it, and it appears to me, as logic would hold, and I'll talk about it in a minute, that if you're a private institution, as one of these things cited even in his own brief, you are not burdened with the constitutional limitations and all, and maybe statutory, like a public school has all these educational statutes that may apply, that may not apply, don't apply to private institutions. So those are the things that put additional safeguards that give the potential for less opportunity to defer in certain situations if there's violations of constitutions and so forth. But this court also pointed out quickly on, this is a state court case. This is a breach of contract case in the state of Texas. It involves, it doesn't involve a constitutional issue. It's not the ADA involved. It's not a racial issue. It's not a sex discrimination. It's a breach of contract case. Now, this court has even said, even in the context if it was a public university, that, in fact, Perez versus A&M, Fifth Circuit, said, they were arguing about being tardy, and she said, well, that was disciplinary. She was also a nurse, trying to become a nurse in that program. And she got let out of the program. And the court found that just because you are late or whatever, that's one of the reasons, that's part of your academic progress that they're looking at. That's part of academics. And especially in a clinical sense, we're looking at all those things as well. So because it's critically important with the subjective look, it's not just what you see on paper, which is what we just heard about, but it's what the people know, what her attitude is, and whether or not she's progressing. The cases talk about, it's not simply that she passed a test or didn't pass a test. They have to evaluate. And this is, she finally fought her way after two years to get to CR2 before she failed again. But she had three more levels to go. The university in Midwestern is entitled to say, look, enough is enough. She's not progressing. And she has different characteristics that we do not approve. It is not for this court. This court has said, I think in 1976, there's never been a case that they're aware of where they have second-guessed the academic reasoning. If it's truly an academic decision, I don't think there's any question that even if you try to combine some of the arguments they make about it being a combination of disciplinary stuff, the documents document that she was fired for are purely academic reasons in any event. She got plenty of due process, but I don't think there's really, she's due any, because in this case, it is a state case. It's not a constitutional case. It's not a public entity. And in TSU versus Villarreal, the Supreme Court said there is no property interest to be protected with regard to a substantive due process claim for continuing your education. And so they don't even have that. And this court, I think, questioned that in regards to a federal case. And that may have been in Pickett, which is another case I didn't cite. That's 37-4-10-13. It's got two-thirds of the justices sitting before me. But you said in that case, the Supreme Court had not stated whether continuing education is a protected property right. Well, that was involving tech. This is a private institution. The Supreme Court has said there is not one. And that was even in regards to the continuing. That was a law case. This guy, in this situation, we're dealing with someone who is actually medically treating patients. So there is some great cases. I think I have five minutes left. There are some great cases that I cited and I added in my Rule 28 brief. Because really, what we wanted to show is what is, if it's not federalism, which I couldn't follow in the argument, then where does this inherent right come from? And in the cases that I cited in the brief called Hartsell v. KE and Hartsell v. SO, Troth is a great case. It's an appellate case that the dissent, Justice Kelly wrote a dissenting opinion, which found that the inherent right, and discussed what is the inherent authority for this idea of being able for an institution to make its own decisions. And the word is, and I've seen plenty of other cases used by this court, is academic freedom and autonomy. It's not federalism. It's academic freedom and autonomy. That crosses all barriers. It doesn't matter whether you're a public or a private institution. The same policy would affect that. Let me just read a quick quote from there. Next, and this is page 239 of the Troth case. Next, Texas law has recognized inherent university authority by recognizing academic authorities in private universities, which do not exist or enjoy authority because of statutes like state universities do. For example, the Second Circuit affirmed to take nothing judgment, and then it cites the Gwynn case. And of course, there's other cases that talk about this doctrine. And what I also found was interesting, she also cited this court's opinion, in my hub no god nossen, not sure I'm saying that right, 529 Fed Second at 450, where this court applied in citing this kind of law of academic decision making and the deferral to it. It actually, according to the justice's dissenting opinion, it said, it applied private university precedent to a public case to uphold a public university's wide latitude and discretion afforded by the courts to educational institutions in framing their academic degree requirements. So in other words, it doesn't matter whether it's public or private. In fact, if it's public, there is way more potential that things can get involved because you've got the state actor involved. In fact, he talks about that. He purports to make it sound like it's helpful, but I found his brief in many cases. His central theme appears in 13, that if it says it's federal because public education is committed to control of state and local authorities. And he cites that on 13. Well, state and local authorities also, that language is used with regard to private institutions too. State and local educational institutions. And Justice Kelly makes that distinction. It's educational institutions, not public or private. And it's very logical. And the case of Hartzell, which found there was enough basis in the statutes to find, by the way, they're trying to take away a degree after the degree has already been awarded based upon conduct that occurred during his educational period. But the court found enough evidence or latitude in the inherent power. But it also referenced the dissenting opinion, which talked about that by Kelly, which talks about, and this is what I think is really cool, it talks about the heart of the matter. And she cited something about the, it wasn't these other things, it wasn't statutes or whatever. The heart of the matter, whether it's public or private, was that broad power, authority to make academic decisions, and which was something they already had inherently. And she talks about it and explains it, and talks about it in much more detail. Much greater detail. But the whole deal is it doesn't matter whether it's this or that, public or private, if today, by the way, in the Todd case, another one of those cases, the court said if we have to allow our professors or whatever or the people he mentioned in this case to be subject to Ms. Thug who wants to come in and rework the program in her image, then we're in big trouble. We'll be in court every Tuesday or every Monday with those kinds of cases. I didn't like my grade. I didn't like this. I didn't like that. That is not going to work. That's what we have here, and it should not be the case. This court should take this case and clear up any confusion, if there is any, about the use of academic decision making with regard to private institutions. All right. Thank you, Mr. Green. Mr. Canales? Good morning. And may it please the court, Hector Canales, on behalf of Appali Emergence Health. Ms. Thug appeals a trial court's dismissal of her fraud and tortious interference with the contract's claim. But at its core, Thug's cause of actions, regardless of how they're played, as fraud or tortious interference, amount to a challenge of her academic dismissal and the evaluation of my client and of her academic performance and progress being made. That particular issue has been the subject of nearly 50 years of the academic deference doctrine, began by the Supreme Court with Horowitz, of which the court is well aware. Judge Smith, you are correct. There are at least four. But there are numerous state court cases, state courts of appeal cases, and Texas Supreme Court cases, which my co-counsel has already alluded to, which recognize and adopt the academic deference principle, not only as it applies to universities, but as it relates to my client, as to faculty. As the court is aware, my client serves, or Ms. Thug was in her clinical portion of her education. She, prior to her coming to Corpus Christi, she had served in the academic or the didactic classroom portion in New Mexico. It wasn't until October 8th of 2018, after Ms. Thug had had failures in her classroom portion in New Mexico, and after the academic decisions had been made there by others, by Midwestern and other faculty there, that she was given an opportunity to come to Corpus Christi. And it was that point in time, and only in 2018, two years after she began in New Mexico, that she interacted for the first time with Emergence Health as the clinical rotation supervisor, the people who would effectively... the teaching hospital situation, right? Whereas in the medical doctors, they go through a residency program, they do the clinical portions. And it's very... What we know from the last 50 years of case law is that the deference goes to the... not just the university, but to the faculty in terms of their evaluations, both the SMU... Todd versus SMU, the Ginn versus TCU, which are both courts of appeal cases, both cite and reference and argue and adopt the arguments of the Supreme Court in Ewing and in Horowitz that courts are ill-equipped to... and are not to take the place of the academic judgments, because it is the preceptors in this case, it is the faculty who are actually there in the surgery rooms, in the hospitals, interacting with these candidates for, in this case, for a CRNA. And the courts are ill-equipped to second-guess and read those faculty decisions. Now, appellants are inviting this court to abandon that 50 years of sound judicial policy and philosophy that... And they want to turn the classrooms into courtrooms. And they want to subject professors, faculty, other professional evaluators, nurse evaluators, physician evaluators. This would apply equally to teaching hospitals and doctors who evaluate residents, the surgeons who are there working with these CRNAs during these surgeries, and says, no, if we don't like your evaluation, we're going to sue you. And we're going to make a jury and try to create a fact issue by saying, I don't like my grade. Not even just hypothetically a failing grade, but maybe my evaluation wasn't high enough. If the scale is on a 0 to 5, you know what, you only gave me a 3. I think I was entitled to a 5. That is the exact type of situation. This court should reject that invitation. The trial court properly applied these principles to the situation and the facts before the court as it relates to Ms. Sud. There is, so what we have in this case is this dispute about an academic evaluation attempting to be reframed as an intentional, as a tortuous interference with a supposed contract between a student and the university. Effectively what they're saying is that a faculty member, an evaluator giving a grade, is actionable. And this circuit, our Supreme Court in Texas, says that is not an actionable, it's not an actionable act. This is not a switch in some paradigm. What we are asking the court is to continue to apply this precedent that it has justly, and I think correctly, found that protects the universities and their faculties. Lest we, as one of the Court of Appeals opinions, I believe it is the Genn case, says we truly will hang the sword of Damocles over these faculty. By the faculty having to second guess and wonder if I'm giving this grade and the student disagrees with my academic evaluation of them, I'm going to be sued. That is not some dramatic shift. It would be a dramatic shift to the opposite, that I believe appellants are asking for in this case. With the minute I have left, I'd like to emphasize this point. While a grade does in fact, or an evaluation does in fact, impact on a student's ability to progress, here, there is no evidence, there is nothing to suggest, that it's a tortious act. It's as if when we're trying cases, and a party argues, well, 403, this is unfairly prejudicial. All evidence is prejudicial. The question is, is it unfairly prejudicial? This act may be influencing, it may impact a student's outcome. But the question is, is it tortious? Is there some intent? Is there some wrong in evaluating? My client here did their duty, did their moral and contractual duty in evaluating Ms. Sugg. That in and of itself is worthy, that in and of itself alone is worthy of summary judgment. There's no basis, the court was correct in finding that that claim should be dismissed. They did not appeal any other cause of action. There was eight that they had against us, against E.H. And the only two they brought up on appeal were fraud and intentional interference with the contractual relationship. So with that, Your Honor, my time is up. And we respectfully request that the court affirm the trial court's granting the motion for summary judgment. Thank you. Thank you, Mr. Canales. Mr. Howard? Thank you, Your Honor. Hello. Remind us what were the alleged material misrepresentations. And may I please, Your Honor, as to Midwestern or as to Emergence Health? I'm just reading from the end of your opening brief. So that would be Emergence Health. Mr. Epstein, the clinical coordinator, represented to Ms. Sugg that she was free to choose which preceptor she worked with. That's record excerpts at 3250. But then he moved the goalposts and told Midwestern University that Ms. Sugg had gained the system and manipulated the process by choosing her own professors such that her positive evaluations were, quote, overblown and exaggerated. That's at record 2754. And it is by that action of telling Midwestern University to ignore the 80 contemporaneous positive evaluations and instead subject his opinion, contrary to his representation to Ms. Sugg, that she could choose whoever she wants. That's a fraudulent misrepresentation. What I didn't hear in all of that argument was any answer to the question of who is a private university's watchdog because, again, they hope to not have one. And I'll talk to my colleague Mr. Green's arguments first. I tend to agree with him because he did ask... This is a question of whether or not we'd get there as it regards academic discretion. And, quote, if it is truly an academic discretion. That is the issue before the court for three different reasons. It is not. Academic decisions only apply in the context of public universities. Academic discretions must be shown to be academic. And here there is a contrary record of Midwestern's own documents that says this is not an academic decision. Third, it's not being made by any academics itself. That is the fundamental issue. The district court assumed that to be so because appellees just say it is so. Can it be both? Can it be academic and simultaneously be discipline? Not according to Midwestern's documents. There are two separate and independent bases for an appeal. There are academic appeals and disciplinary appeals. You only get one. There's an ultimate decision for... which rests in different people depending on which appeal you take. Again, we are not... and it takes a little out of order... we're not telling them you don't have academic freedom. We're not telling them we're going to police your grading. That's never been a case. That's never been part of this case. That's a parade of horribles that does not exist. What we say is in your contracts, in your documents, you said this is what happens. You are the ones as the university that have absolute bargaining power in those contracts. You have the absolute ability to change those contracts for the next semester. But when you contractually agree and you take hundreds of thousands of dollars from a student, you're obligated to follow your contractual obligations. The other cases that we talked about, like the Villa Riel case again, that was a case in which the academic discretion was uncontested. And again, through Mr. Green's argument, I was a little confused as to whether he was arguing due process or contract. We are arguing contract. This is a contract case, and that puts us outside the bounds of many of these cases. I wasn't really planning on addressing the cases filed by Mr. Green on Thursday... I'm sorry, Sunday night, but I think some of it's very important. He relies a lot on the dissent of Trouth, which was a plea to the jurisdiction, which obviously deals with public issues. But in that case, it says, as for contract, although private universities' relationships with their students arise in contract, nothing was before the court regarding TCU's contract with a student or application of any of those terms. That's the opposite of what we're doing here. The other cases, for example, the Todd v. Southern SMU case, that case was remanded to the trial court for evaluation of contractual issues. And the Island v. Wolf case, it cites this court held, quote, a school's catalog constitutes a written contract between the educational institution and the patron where entrance is under its terms. That is what we're talking about here. We're talking about a contract case, not a due process case, and the Horowitz academic discretion only arises in the latter. That's the fundamental difference. With respect to my colleague Mr. Canales' argument, I gave you some evidence with respect to the claims of torts and inference, but it's very important to recognize they are now claiming they are faculty. They are independent contractors of independent contractors. All of the evidence demonstrates they had no academic experience or training, but this is once again an attempt to gloss over the material issues in the case to fit themselves into a small hole where nobody gets to look at what they do. Ms. Sung's entitled to a jury to evaluate whether or not that's true. Thank you, Your Honor. All right. Thank you, Mr. Howard. Your case and all of today's cases are under submission.